IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LAURA STAHL                          :

                                     :

v.                                   :   Civil Action WMN-00-3211

                                     :

TODD STEWART, et al.                 :

#### MEMORANDUM

Before the Court is Defendants' Motion for Summary Judgment. Paper No. 23.  The motion is fully briefed.  Upon review of the pleadings and the applicable case law, the Court determines that no hearing is necessary and that Defendants' motion should be granted.

### I.   FACTUAL BACKGROUND

This action arises out of a dispute over the manner in which Defendants sold a flood insurance policy to Plaintiffs, and later adjusted a claim on that policy.  The following facts, except as otherwise noted, are undisputed.

On March 27, 1998, Plaintiffs Roger and Laura Stahl purchased real property located on 516 Lime Landing Road in Millington, Maryland.  The property consisted of a single dwelling, boathouse, garage, shed, and gazebo situated on a lot slightly more than one acre in size and located on the Chester River.  Plaintiffs purchased the property for $129,500.

Because the property was located in an area subject to flooding, Plaintiffs were told that they needed to obtain flood

insurance in order to go to closing. Plaintiffs purchased a
flood policy for the dwelling with coverage limits of $90,000, in
addition to a standard homeowner policy for the dwelling with
$87,800 of coverage. These policies were purchased through
Defendant Todd Stewart, an agent of Defendant State Farm Fire and
Casualty Company [State Farm]. Defendant Joanna Well, another
agent of Defendant State Farm, was also involved in the sale of
the policies, although there is some disagreement as to the
extent of her involvement.

The flood policy in question was issued under the National
Flood Insurance Program [NFIP] and is known as a Standard Flood
Insurance Policy [SFIP]. Both the NFIP and the SFIPs issued
through the program are highly regulated under federal law and
are administered under the Federal Emergency Management Agency
[FEMA]. The SFIP itself is written by the federal government,
but is issued by "Write-Your-Own Program Carriers [WYO carriers],
like Defendant State Farm. As the name "Standard Flood Insurance
Policy" implies, the policy's terms and provisions are
standardized by the federal government and cannot be altered or
modified by the WYO carriers. See 44 C.F.R. Pt. 61, App. A-1
(setting out the terms of the SFIP). Furthermore, payments of
claims on SFIPs ultimately come from the United States treasury,
and FEMA also reimburses WYO carriers for costs associated with
defending claims. Thus, State Farm's role in this action is that

2

of a "fiscal agent" of the United States.  See Van Holt v. Liberty Mut. Fire Ins. Co., 163 F.3d 1612 (3rd Cir. 1998).

On September 16, 1999, the Chester River rose over its banks and Plaintiffs' home was flooded and severely damaged.  The very next day, an adjuster for State Farm, Kurt Bartell, came to the property to inspect the damage.  According to Plaintiffs, Bartell's expertise was limited to fire claims and it was not until October 10, 1999, that a flood adjuster came to evaluate the damage.  In settlement of the claim, State Farm sent checks to Plaintiffs on the following dates and for the following amounts: on October 29, 1999, checks for $26,543.21 and $3,904.10; on December 29, 1999, a check for $10,669.12; and on January 6, 2000, a check for $28,973.57.  These checks total $90,000, the limit of the policy.

In addition, State Farm paid Plaintiffs an additional $15,000 under an "Increased Cost of Compliance Endorsement." This endorsement is intended to help defray additional costs a homeowner might encounter where local ordinances require that certain demolition, flood proofing, and building of new foundations be completed before rebuilding on a flood plain. Under the terms of the endorsement, payment is to be made only after demolition and reconstruction costs are actually incurred. Defendants maintain, and Plaintiffs do not dispute, that although the demolition has been completed, the new foundation has not

3

been constructed.  Thus, State Farm may have been premature in
making the full payment of $15,000.

Asserting, inter alia, that Defendants failed to make
certain that Plaintiffs purchased adequate insurance to protect
their property, and unduly delayed the payment of their claim,
Plaintiff Laura Stahl brought a nine count complaint in the
Circuit Court for Queen Anne's County.  Defendants removed the
action to this Court.  Thereafter, Laura Stahl moved to amend the
complaint to add two additional claims, and to add her husband as
a Plaintiff.  As damages, the Amended Complaint seeks the award
of the following: the amount that the property is alleged to have
been underinsured; attorney's fees; the loss of income from
Plaintiff Laura Stahl's employment (as she was forced to devote
her time to the pursuit of the insurance claim and this lawsuit);
living expenses; and, over two million dollars, over and above
Plaintiffs' actual damages, for "distress, hardship and
inconvenience."

The Court granted the motion to amend the complaint on
January 16, 2001.  Defendants have now moved for summary
judgment as to all claims.

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine
issue of material fact and [where] the moving party is entitled
to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  While

4

the non-moving party is entitled to have "all reasonable
inferences . . . drawn in its respective favor," <u>Felty v. Graves-
Humphreys Co.</u>, 818 F.2d 1126, 1129 (4th Cir. 1987), the
non-movant, in resisting summary judgment, must "go beyond the
pleadings and by [its] own affidavits . . . depositions, answers
to interrogatories, and admissions on file, designate specific
facts showing that there is a genuine issue for trial." <u>Celotex
Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986). Summary judgment is
appropriate, therefore, where there is no genuine issue of
material fact that could lead a rational trier of fact to find
for the nonmoving party. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, 252 (1986).

## III. **DISCUSSION**

Before addressing the merits of Plaintiffs' specific claims,
the Court notes that several of the state law claims, as well as
some of some of the categories of damages prayed for, are
preempted under federal law. A recent decision from the District
of New Jersey, <u>Messa v. Omaha Property & Casualty Ins. Co.</u>, 122
F.Supp.2d (D.N.J. 2000), provides a helpful overview of the
relevant case law on the issue of federal preemptions of claims
related to SFIPs. Drawing a distinction between state law claims
arising out of the sale of SFIPs, and those arising out of the
handling and processing of SFIP claims, the court summarized the
rationale for finding the latter claims preempted, while allowing

the former claims to be brought:

>       While it makes sense to hold WYO insurers
> liable when they engage in fraudulent behavior
> designed to procure customers to get flood
> insurance through them - instead of through
> other insurers or not at all - WYO insurers
> simply have no financial incentive to act in
> bad faith in handling claims.  If WYO insurers
> were to be held liable under different states'
> differing laws for their behavior during the
> claims handling process, it would make it much
> less likely that private insurers would be
> willing to participate in the NFIP, making
> flood insurance impossible to obtain at all,
> and increasing the burden on the federal
> treasury from flood-related disaster relief.
> That is precisely the situation that the NFIP
> was designed to remedy.

122 F.Supp.2d at 522-23.

The Court finds this reasoning persuasive and, accordingly, finds that Plaintiffs' state law-based, extra-contractual causes of action or prayers for damages related to the processing of Plaintiffs' insurance claim are preempted.  Specifically, this includes Counts 9 and 11 of the Amended Complaint, and Plaintiffs' claim for punitive damages and attorney's fees, insofar as they relate to the alleged delay in processing the claim.[1]

Turning to the remaining counts, the Court will address each count, seriatim.

In Count 1, Plaintiffs allege that Defendants violated Maryland law by having Joanna Wells involved in the sale of the

---

[1] Furthermore, the Court notes that Plaintiffs have no contractual remedy under the policy related to the processing of their claim in that State Farm paid Plaintiffs the full policy limits, as well as the full limits of the "Increased Cost of Compliance Endorsement."

SFIP when she was not specifically licensed to sell such policies. Plaintiffs, however, have identified no authority for the position that there is a special license requirement for selling flood policies. Defendant Wells has a Maryland license to sell property and casualty insurance, which is all that is required to sell SFIPs. See Affidavit of Todd Stewart ¶¶ 5, 6, Def. Exh. F.

Count 2 is captioned, "Improper Rate Increase Notification." Presumably, this claim arises out of an error that Defendant Stewart made when initially determining the premium to be paid for Plaintiffs' policy. Because Stewart incorrectly identified the applicable flood zone when initially determining the applicable premium, he quoted an amount significantly lower than that required to purchase $90,000 worth of flood insurance. Defendants allege that after this mistake was discovered and the premium recalculated, they sent notice to Plaintiffs that their premium payments were insufficient. Plaintiffs deny ever receiving this notice. When State Farm received no response from Plaintiffs, it reformed the policy to reflect a policy limit consistent with the amount of premium paid. This resulted in a drop of policy limits to $35,400.

Count 8 appears to arise from this same error. Citing to two provisions of federal regulations governing "Loans in Areas Having Special Flood Hazards," 12 C.F.R. §§ 22.3(a), 339.3(a), Plaintiffs allege that Defendants "were willfully negligent when they allowed the coverage to drop to $35,400 without sending a second, possibly a third, notice to ensure Plaintiffs received supposed initial

7

notification of rate increase so that either CFR limit was met."
Amended Complaint at 4.

Assuming, without deciding, that Defendant erred in the manner
in which they notified Plaintiffs of the change in premium or
change in policy limits, or that the banking regulations were
somehow applicable to Defendants, Plaintiff can show no damages.
It is undisputed that State Farm paid the entire $90,000 of the
original policy limit, rendering any notice issue irrelevant.  In
fact, it would appear that Plaintiffs received far more insurance
coverage than they ever actually paid for.

Counts 3, 4, and 6 are closely related.  In Count 3,
Plaintiffs assert that "coverage on a flood policy has two building
coverage types available, assessed value or replacement value."
Amended Complaint at 3.  Plaintiffs further assert that, "Mrs.
Stahl was unaware that assessed value was not the value to rebuild
the home due to a loss of any cause and Mr. Stewart neglected to
ensure Mrs. Stahl was knowledgeable of such."  Id.  In Count 4,
Plaintiffs allege that Stewart was "willful[ly] negligent" in
misinforming Mrs. Stahl that no flood insurance coverage was
available for the garage and the boathouse.  Count 6 appears to
allege that Stewart was negligent in failing to inform Plaintiffs
that the same two types of flood insurance that were available for
the dwelling, "assessed value" and "replacement value," were also
available for Plaintiff's outbuildings.

As Defendants note, there are certain factual inaccuracies in
Plaintiffs' allegations.  There are not two types of coverage

8

available under the SFIP.  The policy provides,

> If at the time of loss the total amount of
> insurance applicable to the dwelling is 80% or
> more of the full replacement cost of such
> dwelling or is the maximum amount of insurance
> available under the National Flood Insurance
> Program, the coverage of this policy
> applicable to the dwelling is extended to
> include the full cost of repair or replacement
> (without deduction for depreciation).

SFIP at 11, Defs' Exh. E.  The policy goes on to state, however,

> Our liability for loss under this policy shall
> not exceed the smallest of the following
> amounts:
>
> 1. The limit of liability of this policy
> applicable to the damaged or destroyed
> building; or
>
> 2. The replacement cost of the dwelling or any
> part thereof identical with such dwelling on
> the same premises and intended for the same
> occupancy and use; or
>
> 3.  The amount actually and necessarily
> expended in repairing or replacing said
> dwelling or any part thereof intended for the
> same occupancy and use.

Id. (emphasis added).  Thus, assuming that the policy limit of

$90,000 is at least 80% of the full replacement cost of

Plaintiff's dwelling, then Plaintiffs were entitled to

"replacement costs" under the policy, but only to the extent of

the policy limits.  This is the amount that they were paid.

     To the extent, therefore, that Counts 3 and 6 are alleging

that Stewart was negligent in failing to inform Plaintiffs of an

option that was never available, Defendants are entitled to

9

summary judgment as to those counts.  Reading these counts more
liberally, however, the Court could construe them as alleging
simply that Stewart should have advised Plaintiffs that insuring
their property to its assessed value, only, might not provide
sufficient funds, in the case of a total loss, to permit
Plaintiff to replace their loss.  Read in this light, the amended
complaint would allege that Stewart had a duty to inform
Plaintiffs that they were underinsured.

Again, Plaintiffs have provided no authority that would
support the imposition of such a duty on an insurance agent, nor
does this Court believe that Maryland law would impose liability
in this context.  The Maryland Court of Special Appeals recently
discussed the duty of an insurance agent or broker in a similar
situation.  Sadler v. Loomis Company, 139 Md. App. 374 (2001).

In Sadler, the plaintiff, an elderly driver, was involved in
a collision with a motorcyclist which resulted in the amputation
of the motorcyclist's leg.  When the motorcyclist filed a $10
million negligence suit against Sadler, "it became painfully
evident that Sadler was woefully underinsured."  139 Md. at 377.
Her insurance policy provided maximum coverage of $100,000.
After Plaintiff settled the motorcyclist's lawsuit for close to
$1 million, which resulted in the loss of her waterfront home in
Annapolis and much of her savings, she sued the insurance
brokerage agency through which she procured the inadequate

10

policy, claiming that it "was negligent because it knew of
Sadler's financial position, yet failed to provide her with
periodic quotes as to the cost of additional protection, or
sufficient information to enable her to make an informed decision
as to an appropriate level of liability coverage."  Id.

     After reviewing decisions from Maryland and other
jurisdictions, the Court of Special Appeals summarized the
reasons given for not holding insurance brokers or agents to such
a duty.  That court's discussion is repeated here, at length,
because many of the reasons identified are equally applicable to
the case at bar.

               Many of the decisions of other
          jurisdictions focus on the view that the
          insured usually is in the best position to
          assess the value of his or her assets, and
          the extent of potential loss in the event
          that a risk materializes, whether by adverse
          judgment, business interruption, fire, theft,
          or the like.  Similarly, the insured is
          generally considered best able to balance the
          factors relating to potential economic loss
          against the expense of purchasing additional
          insurance, the likelihood that a particular
          risk will materialize, and the insured's own
          comfort level with the risks versus the cost
          of greater protection.

               These cases suggest, then, that the amount
          of insurance coverage is a trade off between
          cost and risk, and risk is in part subjective
          and dependent on other available resources.
          Thus, the question of adequacy of coverage is
          necessarily a matter of personal opinion. . .
          .

                              11

Moreover, some of the cases reflect a belief that responsibility for the amount of coverage ought to fall on the insured, because an agent or broker cannot readily verify the accuracy of financial information that an insured provides, and must instead rely on the information supplied by the insured. Absent full disclosure by an insured, which an agent or broker cannot compel, an agent or broker would have no way to ascertain an insured's exposure. Nor would the agent or broker necessarily know of a change in the insured's circumstances or economic status, which could affect the suitability of existing coverage.

Further, several cases eschew the idea of a broker or agent serving in an advisory capacity. They suggest that to require an agent or broker to offer unsolicited advice to its insured, or even to inquire of its insured as to the suitability of existing coverage, would transform insurance agents or brokers into risk managers with guarantor status, or personal financial counselors or guardians of the insured, which goes well beyond anything required by law or dictated by common sense.

Still other decisions recognize that the view espoused by appellant could readily encourage an insured who suffers a loss to fabricate that he or she would have bought more insurance had it been recommended. The creation of a duty to advise could afford the insureds the opportunity to insure after the loss by merely asserting they would have bought the additional coverage had it been offered. The concept of such "retroactive insurance," turns the entire theory of insurance on its ear.

Moreover, some rulings suggest that courts should not overlook that imposition of the kind of duty urged by appellant would simply

12

> encourage agents and brokers to act
> defensively, by advising their customers to
> purchase the maximum available coverage,
> regardless of cost, rather than more modest
> packages that most people of similar means
> would find suitable.  This could readily
> result in a mis-allocation of personal
> resources of individual insureds.
> Conceivably, the obvious extension of the
> position advocated by appellant would subject
> brokers or agents to liability for failing to
> advise their own clients of every possible
> insurance option, or even an arguably better
> package of insurance offered by a competitor.
>
>      Other decisions underscore that the issue
> presented here is a matter for the state
> legislatures to resolve.  In view of the
> important public policy considerations, these
> courts have expressed serious concern about
> inappropriate judicial law making.

Id. at 400-402 (citations and internal quotations omitted).

For all these reasons, the Court of Special Appeals held

that "we have determined that, in the absence of a special

relationship,[2] an insurance agent or broker has no affirmative,

---

[2] The court explained elsewhere in the opinion the meaning of
the term "special relationship" in the insurance context.

> "A special relationship in the context of
> insurance requires more than the ordinary
> insurer-insured relationship. It may be shown
> when an insurance agent or broker holds
> himself or herself out as a highly skilled
> insurance expert, and the insured relies to
> his detriment on that expertise. A special
> relationship may also be demonstrated by a
> long term relationship of confidence, in which
> the agent or broker assumes the duty to render
> advice, or has been asked by the insured to
> provide advice, and the adviser is compensated
> accordingly, above and beyond the premiums

13

legally cognizable tort duty to provide unsolicited advice to an insured regarding the adequacy of liability coverage." Id. at 410. While there are some obvious differences in imposing a duty on an insurance agent to advise an insured to increase automobile liability insurance and advising homeowners as to the amount of flood coverage that they should carry, the same basic consideration summarized by the Sadler court apply in both contexts. Accordingly, this Court holds that Defendant Stewart did not have an affirmative duty to make certain that Plaintiffs purchased sufficient insurance to enable them to rebuild their home or outbuildings.

Plaintiffs' claim in Count 4 stands on a slightly different footing. Plaintiffs allege, not that Stewart failed to properly advise them as to whether to purchase flood coverage for the outbuildings on the property, but that he negligently told them that such coverage was not available. Stewart, in a sworn affidavit, testifies that he explained to Mrs. Stahl that she might be able to purchase a separate policy for the outbuildings, but that she stated that she was not interested. Stewart Aff. at ¶ 14. In their opposition, Plaintiffs deny that Stewart ever informed Mrs. Stahl of the availability of separate coverage.

_____

customarily earned.

Id. at 392. The facts in this case do not give rise to the finding of such a special relationship.

14

Opp. at 11.

Had Plaintiffs supported this denial with any admissible evidence, the Court would need to consider whether Plaintiffs could go forward with this limited claim. Plaintiffs, however, offered no such support. The Court notes that Plaintiffs were made aware of the need to support their arguments with evidence. Because Plaintiffs were proceeding pro se, upon the filing of Defendants' motion, the Court sent Plaintiffs a letter on May 1, 2001, explaining that they could file, in opposition to the motion, "any relevant materials, including affidavits or statements under oath or affirmation, or subject to the penalties of perjury, admitting, contradicting, or explaining the facts and matters asserted in the motion." The letter further warned that, "[i]f you do not file a timely and appropriate written response, or, if such response fails to show by affidavit or statement under penalty of perjury that there is a genuine dispute of material fact, summary judgment may be entered against you." Despite these instructions, Plaintiffs failed to submit evidence supporting this, or any claim. Accordingly, the Court will grant summary judgment as to Count 4.

In Count 5, Plaintiffs alleged that Defendants were negligent in not informing Mrs. Stahl that additional living expenses were insurable but were not included in the Plaintiffs' SFIP. In the opposition, however, Plaintiffs conceded that the

15

SFIP does not allow for coverage of additional living expenses.

Count 7 raises the claim that Stewart did not ensure that Mrs. Stahl was aware that the homeowners' policy had two types of coverage available for personal property. In moving for summary judgment, Defendants submitted Mrs. Stahl's deposition testimony in which she admitted that she was offered contents coverage in the flood policy but declined it because it was too expensive. Laura Stahl Dep. at 65-66. In the opposition to the motion, Plaintiffs point out that the Amended Complaint refers not to the flood policy, but to the homeowners policy. Plaintiffs nowhere explain, however, in the Amended Complaint, or in their opposition, how they were harmed by the alleged absence of contents coverage in the homeowners policy.

Finally, in Count 10, Plaintiffs allege Defendant Wells was willfully negligent in failing to ensure that Roger Stahl's name was included on the flood policy. Again, Plaintiffs do not explain how they may have been harmed by this alleged omission. The absence or presence of Mr. Stahl's name on the policy does not alter the undisputed fact that State Farm paid the Stahls' claim on the flood policy, up to the policy limits.

## IV.  CONCLUSION

For the above-stated reasons, Defendants' Motion for Summary

16

Judgment will be granted.  A separate order will issue.


William M. Nickerson
United States District Judge

Dated: December 17, 2001